1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KENNETH A. JONES,

11              Petitioner,              No. CIV S-02-0979 DFL KJM P

12        vs.

13   TOM L. CAREY,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus challenging his Sacramento County conviction for vandalism, false imprisonment,

18   and criminal threats.

19   I.  Factual And Procedural Background

20        A.  The Underlying Offense

21            Stacey Scherbenske began to date petitioner in 1999.  RT 204.[1]  When petitioner

22   lost his job, he became very possessive, and concerned about who came to visit.  RT 206-207.

23   On one occasion, he shoved her into her entertainment center; on another, he threw a mug at her;

24   /////

25   _____

26        [1]  RT refers to the Reporter's Transcript of the state court proceedings and CT to the
     Clerk's Transcript, lodged with this court.

on still another, he became angry and stuck a knife into the wall.  RT 208, 212.  Scherbenske did

not call the police after any of these incidents.  RT 210, 214.

On February 5, 2000, Jones became upset with Scherbenske after she woke him

up to take a phone call from Rada Medjed, a former girlfriend and mother of his child.  RT 214-

215.  He told her never to wake him up like that again and Scherbenske told petitioner not to talk

to her like that.  RT 286.  The two argued until Scherbenske suggested petitioner go call Medjed.

RT 288.  Petitioner threw a tequila bottle on the floor between her legs; the bottle shattered,

cutting Scherbenske on both legs.  RT 217-219, 288-289.

Scherbenske went to take a bath, but could hear petitioner yelling and breaking

glasses.  RT 219.  Petitioner was yelling at Scherbenske to hurry up so he could take a shower.

RT 223-224, 291.  As she went to the dressing room, petitioner slapped Scherbenske.  RT 225.

When she went into her bedroom, petitioner took a knife out of his back pocket, where he

customarily put it when the couple argued.  RT 227.  Petitioner said repeatedly, "You are lucky

your daughter is here or I would kill you."  RT 230.  He also said, "I should just kill you" in an

"ugly" tone.  RT 231-232.  Petitioner was holding the knife when he said these things.  RT 232.

Scherbenske was aware that petitioner had been convicted after an incident of domestic violence

against Medjed.  RT 233.

As Scherbenske bent to retrieve a shirt from the laundry basket, petitioner swung

the knife toward her.  RT 237.  Scherbenske slipped and petitioner stuck the knife into the wall.

RT 237.  She tried to calm petitioner as she moved to her daughter's room and then to the front

door.  RT 241-242.  Petitioner locked the door and told Scherbenske that she was not going

anywhere.  RT 242.  She decided not to risk leaving because she did not want any harm to come

to her daughter.  RT 244-245.

Petitioner began to harass Scherbenske to return the money he had contributed for

the January rent.  RT 245-246, 271.  Scherbenske called several relatives but nobody was home.

RT 246.  Petitioner then ripped the phone cord out of the wall and threw the computer monitor

2

1    across the room, announcing that he would not leave until he broke everything.  RT 247-248.

2    After petitioner broke Scherbenske's coffee table, she and her daughter left the house with

3    petitioner.  She felt she did not have a choice.  RT 248, 250.

4          Scherbenske drove petitioner to the car dealership where petitioner had put a

5    down payment on a truck, though in Scherbenske's name.  RT 251-253.  Scherbenske cancelled

6    the purchase and received a check for the deposit in her name.  RT 253.  She had asked the

7    salesman for cash, but when he told her he could not give her cash, she cried.  Petitioner, who

8    was with her, seemed calm.  RT 397.

9          After they left the dealership, Scherbenske tried to turn toward her mother's

10   house, but petitioner prevented her from turning the wheel.  RT 254-255.  She eventually took

11   petitioner to a friend's house and then headed back to her mother's, where she left her daughter.

12   RT 255.  She did not tell her mother what had happened because she did not want her mother to

13   worry.  RT 256.

14         Scherbenske then went to see a friend, David Howard, because she needed to

15   "unwind."  They split a six-pack of beer.  RT 257-258.  She did not tell Howard what had

16   happened.  RT 258.

17         After a couple of hours, Scherbenske returned to her mother's house with her

18   friend Maria in tow.  RT 259.  She waited for her brother Jimmy, and then finally returned home

19   about 10:30 or 11:00 p.m and called police.  RT 260-261.

20         Sacramento police officer Stephen Sanguinetti went to Scherbenske's house

21   around 10:30 p.m. on February 5th.  He noticed broken glass and puncture marks in the kitchen

22   and bedroom walls.  RT 402-403.  He found it difficult to take a statement from Scherbenske

23   who could not give a sequential account of the evening.  RT 405.  Scherbenske told him she

24   thought petitioner was going to come back and kill her.  RT 417.

25   /////

26   /////

3

1    About a week later, petitioner slashed Scherbenske's tires after she refused to let

2 him in the house.  She called police to report petitioner's harassment on February 11th.  RT 263-

3 264.  Nevertheless, the couple spent some time together before petitioner's arrest on March 1st.

4 RT 264.  In fact, petitioner called Scherbenske when he ran out of money and asked her to cash

5 the $500 check from the car dealership.  RT 297.

6    Since petitioner's arrest, Scherbenske has visited him in jail and petitioner has

7 written to her.  RT 265-266.  One letter read in part:

8    Stacey, I went - well, went to Court today.  Not a very - not a very good
     day for me.  They tried to add three more charges to my case, but my
9    lawyer talked them out of that, thank God.  By the way, thanks for not
     going to the DA.  That helps me a lot.  I owe you one, baby.  But - it would
10   be [sic] really help if you don't show up for my trial as a victim or witness.
     I'll still be looking at two years at 85 percent.  At least I'll be clean and off
11   of that fucking dope.

12 RT 267.

13    In the hall during a noon break on one day of petitioner's trial, Scherbenske told

14 petitioner, "They made me do this."  RT 332.  She wanted to let petitioner know she was "not

15 trying to put him away for that long."  RT 339.

16    Linda Barnard, marriage and family counselor, testified about the impact domestic

17 abuse may have on a woman's willingness to report incidents and to reconcile with her abuser.

18 RT 351-393.

19    B.  The Prior Incident

20    In 1997, Kimberley Aardahl was friends with Rada Medjed, who was petitioner's

21 girlfriend.  RT 163-164.  Around 6:00 a.m. on June 23, 1997, Medjed and her daughter Crystal

22 came to Aardahl's apartment.  RT 166.  Over the course of the day, petitioner called many times

23 for Medjed, threatening to kill her, pointed a gun at the women as they stood on Aardahl's

24 balcony, and broke into Aardahl's apartment and again pointed a gun at them.  RT 167, 170, 172-

25 173.

26 /////

4

1      C.  Conviction And Sentence

2              The jury found petitioner not guilty of assault with a deadly weapon, but guilty of

3      making criminal threats, false imprisonment and vandalism.  RT 576-581.  The court sentenced

4      petitioner to a total term of seven years, four months in prison.  CT 251.[2]

5      II.  AEDPA Standards

6              An application for a writ of habeas corpus by a person in custody under a

7      judgment of a state court can be granted only for violations of the Constitution or laws of the

8      United States.  28 U.S.C. § 2254(a).

9              Federal habeas corpus relief is not available for any claim decided on the merits in

10     state court proceedings unless the state court's adjudication of the claim:

11                     (1) resulted in a decision that was contrary to, or involved an
                       unreasonable application of, clearly established federal law, as
12                     determined by the Supreme Court of the United States; or

13                     (2) resulted in a decision that was based on an unreasonable
                       determination of the facts in light of the evidence presented in the
14                     State court proceeding.

15      28 U.S.C. § 2254(d).

16              Although "AEDPA does not require a federal habeas court to adopt any one

17     methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which

18     guide its application.

19              First, the "contrary to" and "unreasonable application" clauses are different.  As

20     the Supreme Court has explained:

21                     A federal habeas court may issue the writ under the "contrary to"
                       clause if the state court applies a rule different from the governing
22                     law set forth in our cases, or if it decides a case differently than we
                       have done on a set of materially indistinguishable facts.  The court
23                     may grant relief under the "unreasonable application" clause if the
                       state court correctly identifies the governing legal principle from
24                     our decisions but unreasonably applies it to the facts of the

25     ────────────────────

26              [2]  The sentence included a concurrent term for a probation violation on a prior burglary
       conviction.

1
2
3

    particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

4 <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state

5 court's decision was either contrary to or an unreasonable application of federal law.  <u>Woodford</u>

6 <u>v. Visciotti</u>, 537 U.S. 19, 25 (2002).  It is appropriate to look to lower court decisions to

7 determine what law has been "clearly established" by the Supreme Court and the reasonableness

8 of a particular application of that law.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir.

9 2000).

10     Second, so long as the state court adjudicated petitioner's claims on the merits, its

11 decision is entitled to deference, no matter how brief.  <u>Lockyer</u>, 538 U.S. at 76; <u>Downs v. Hoyt</u>,

12 232 F.3d 1031, 1035 (9th Cir. 2000).  The California Supreme Court's "postcard" denial of a

13 petition for review is a ruling on the merits of the petition, but this court "looks through" that

14 denial to the last reasoned decision in the case to determine whether the state courts applied

15 clearly established federal law in an unreasonable fashion.  <u>Gaston v. Palmer</u>, 387 F.3d 1004,

16 1013 (9th Cir. 2004); <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991).  However, when the

17 state court does not issue a "reasoned opinion," this court must undertake an independent review

18 of the claims.  <u>Delgado v. Lewis</u>, 223 F.3d 976, 982. (9th Cir. 2002).

19     Third, in determining whether a state court decision is entitled to deference, it is

20 not necessary for the state court to cite or even be aware of the controlling federal authorities "so

21 long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v.</u>

22 <u>Packer</u>, 537 U.S. 3, 8 (2003).  Moreover, a state court opinion need not contain "a formulary

23 statement" of federal law, so long as the fair import of its conclusion is consonant with federal

24 law.  <u>Id</u>.

25 /////

26 /////

III.  <u>Sufficiency Of Evidence Of Criminal Threat</u>

In <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), the Supreme Court examined the role of a habeas court in considering a challenge to the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

<u>Id</u>. at 319 (emphasis in original).

The court continued:

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

<u>Id</u>. at 326.  Constitutionally sufficient evidence need not rule out every hypothesis except that of guilt beyond a reasonable doubt.  <u>Id.</u>  This court must apply the <u>Jackson</u> standard with "explicit reference to the substantive elements of the criminal offense as defined by state law."  <u>Id</u>. at 324 n.16.

Petitioner argues here, as he argued in the Court of Appeal, that his threat did not convey an immediate prospect of execution as required by California Penal Code section 422. The Court of Appeal rejected the argument:

> We conclude a reasonable jury could find that at least defendant's threat, "I should just kill you," was sufficiently unequivocal, unconditional, immediate, and specific to convey an immediate prospect of execution under the circumstances in which defendant made that threat.  There is substantial evidence in the record that the relationship between defendant and Stacey had soured, leading to more than one argument in which defendant wielded a knife, thrusting it into a wall on at least one previous occasion.  On the present occasion, defendant had already broken a bottle at Stacey's feet, broken wine glasses in the dining room, and slapped Stacey in the face.  Pursuing her into the bedroom with a knife in hand, he stood above her as she sat on the bed and said in an ugly tone, "I should just kill you," after already telling her, "You are lucky your daughter is here or I would kill you."  Under all of the surrounding circumstances, the jury could reasonably find that defendant's

7

1  statement, "I should just kill you," was sufficient to convey to
   Stacey an immediate prospect – i.e., possibility–that he would do
2  just that.

3  Answer, Ex. B at 9.

4      The elements of a violation of California Penal Code section 422 are:

5      (1) that the defendant willfully threatened to commit a crime which
       will result in death or great bodily injury to another person, (2) that
6      the defendant made the threat with the specific intent that the
       statement ... is to be taken as a threat, even if there is no intent of
7      actually carrying it out, (3) that the threat–which may be made
       verbally, in writing, or by means of an electronic communication
8      device–was on its fact and under the circumstances in which it
       [was] made, . . . so unequivocal, unconditional, immediate, and
9      specific as to convey to the person threatened, a gravity of purpose
       and an immediate prospect of execution of the threat, (4) that the
10     threat actually caused the person threatened to be in sustained fear
       for his or her own safety or for his or her immediate family's
11     safety, and (5) that the threatened person's fear was reasonabl[e]
       under the circumstances.

12

13 In re George T., 33 Cal. 4th 620, 630 (2004) (citations omitted). Petitioner challenges the

14 sufficiency of the evidence of the "immediacy" element, arguing that the words "I should just kill

15 you" suggest that petitioner "did not intend to kill the victim at that time or at no time." Petition

16 (Pet.) at 11.

17      In People v. Bolin, 18 Cal. 4th 297 (1998), the California Supreme Court

18 considered the question whether a conditional threat satisfied the immediacy requirement of

19 section 422. In that case, defendant had sent a letter from the jail to his daughter's boyfriend,

20 which said, among other things, "'If you ever[] touch my daughter again, I'll have you

21 permanently removed from the face of this Earth." 18 Cal. 4th at 336. The court examined the

22 statute, which provides that the threat must be "'so . . . unconditional . . . *as to convey to the*

23 *person threatened a gravity of purpose and an immediate prospect of execution to the victim.*'"

24 Id. at 339-400. It concluded:

25 /////

26 /////

8

> The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.

Id. at 340 (internal citation omitted).  Accordingly,

> [a] communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning.

In re George T., 33 Cal. 4th at 635.   Such "surrounding circumstances" can include the parties' history, including previous verbal and physical assaults, the victim's knowledge of domestic abuse of prior partners, and physical violence around the time of the communication.  People v. Gaut, 95 Cal. App. 4th 1425, 1431 (2nd Dist. 2002) (threats in letters from jail violated § 422 because of parties' prior history); People v. Butler, 85 Cal. App. 4th 745, 754 (5th Dist. 2000) (defendant grabbed victim's arm when he told her she would "get hurt" if she didn't mind her own business).

        The Court of Appeal's determination was neither an unreasonable determination of the facts or an unreasonable application of the principles of Jackson v. Virginia, 443 U.S. 307 (1979).  The state court relied on the "surrounding circumstances" to find petitioner's statement "I should just kill you" satisfied the requirement of immediacy.  Petitioner's utterance was punctuated by his physical violence, ranging from destruction of property to display of a knife. RT 217-219, 236.  During prior arguments, petitioner had armed himself with a knife.  RT 227. Moreover, Scherbenske was aware of petitioner's earlier armed threats against Medjed.  RT 233; see also RT 172-173.  There was no federal constitutional error.

IV.  The Letter's Reference To Penalty

        At trial, defense counsel argued that petitioner's letter to Scherbenske should be edited to delete the reference to the two years, eight months petitioner was facing and his prediction that he would then be clean because neither statement was probative.  RT 122-123. The court denied the request.  RT 123.

1    The Court of Appeal rejected petitioner's claim:

2        Whatever defendant meant exactly, the evidence has a tendency to
         prove that defendant believed a reference to a certain period of
3        incarceration would help convince Stacey not to testify against
         him, implying of course that he knew Stacey's testimony would be
4        true and that, with her testimony, he would be convicted of the
         offenses with which he was charged.  Because defendant's
5        reference to the punishment he thought he faced even if Stacey did
         not testify tended to bolster the showing of his guilty conscience,
6        the trial court did not abuse its discretion in concluding defendant's
         statement regarding his possible punishment was relevant.

7
         As for defendant's assertion that the court should have excluded
8        his statement regarding his possible punishment under Evidence
         Code section 352, . . . . [w]e conclude the trial court did not abuse
9        its discretion when it concluded the probative value of defendant's
         statement . . . was not substantially outweighed by a probability
10       that its admission would create a substantial danger of undue
         prejudice.  As we explained above, defendant's statement had
11       probative value because it tended to prove defendant's guilty
         conscience and therefore his guilt.   Against this probative value,
12       defendant fails to explain what undue prejudice was likely to have
         flowed from the jury's consideration of his statement . . . .

13

14   Answer, Ex. B at 12-13 (citations omitted).

15       In Jammal v. Van de Kamp, 926 F.2d 918 (9th Cir. 1991), the Ninth Circuit

16   explained:

17       The issue for us, always, is whether the state proceedings satisfied
         due process; the presence or absence of a state law violation is
18       largely beside the point. . . .The issue . . . is not whether
         introduction of [the evidence] violated state law evidentiary
19       principles, but whether the trial court committed an error which
         rendered the trial so arbitrary and fundamentally unfair that it
20       violated federal due process.

21   926 F.2d at 919-20 (internal quotation, citations omitted); see also Colley v. Sumner, 784 F.2d

22   984, 990 (9th Cir. 1986).

23       The admission of petitioner's written prediction of his sentence even if

24   Scherbenske did not show up for trial did not render his trial arbitrarily or fundamentally unfair.

25   Despite the admission of this evidence, the jury was able to consider the strengths and

26   weaknesses of the evidence and acquit petitioner of the charge of assault with a deadly weapon.

RT 576.  Nor has petitioner explained how the jury's awareness of petitioner's prediction (which was never shown to be correct or incorrect) caused it to consider the question of his guilt in a capricious way.  The state Court of Appeal's opinion was not an unreasonable application of federal law.

V.  Prosecutorial Misconduct

At trial, the prosecutor asked Scherbenske to tell the jury about "another incident prior to February 5th where the defendant used a knife in an argument."  Scherbenske replied, "Just when he gets upset, he always used to go to the kitchen drawer and grab a knife."  RT 211-212.  Defense counsel objected that the answer was non-responsive and the court struck it.  RT 212.

During closing argument, the prosecutor explored the evidentiary basis for the criminal threats charge, arguing that petitioner's prior behavior gave immediacy to the threat: "He had used knives in arguments in the past.  She made some statements like whenever we argue, he went for the knife drawer."  RT 490.  Defense counsel objected and asked the court to declare a mistrial.  RT 497-498.  The court denied the motion.  RT 498-499.

The Court of Appeal agreed with petitioner that the prosecutor had committed misconduct when he referred to the stricken testimony, but found any error de minimis.

> Stacey's unstricken testimony that during arguments on prior occasions defendant had the knife in his back pocket was substantially the same as her stricken testimony that when defendant got upset, "he always used to go to the kitchen drawer and grab a knife."  In light of this similarity, the prosecutor's isolated reference to the stricken testimony did not render the trial so fundamentally unfair as to violate defendant's right to due process.  By the same token, we find no reasonable probability that the prosecutor's brief reference to the stricken testimony affected the verdict rendered.

Answer, Ex. B at 16-17.

In general, a prosecutor's actions will be ground for habeas relief if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

11

1  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.

2  637 (1974)).  In determining the impact of misconduct on the trial, a court must place the

3  challenged remark in context.  Darden, 47 U.S. at 179; Greer v. Miller, 483 U.S. 756, 765-66

4  (1987).

5          As the state Court of Appeal observed, the prosecutor did refer to Scherbenske's

6  statement that petitioner always went for the knife drawer when he got upset, which had been

7  stricken on defense counsel's objection that it was unresponsive.  RT 211-212.  Later, however,

8  Scherbenske testified without objection that she knew from "prior incidents" that petitioner

9  would put a knife in his back pocket when the couple argued and had used a knife on at least one

10  prior occasion to poke a hole in the kitchen wall.  RT 227.  This "context" of properly admitted

11  evidence, which conveyed the essence of the stricken testimony, means that the prosecutor's

12  argument, whether or not it was improper, did not taint the trial unfairly.  The Court of Appeal's

13  conclusion is not an unreasonable application of clearly established federal law.

14  VI.  Propensity Evidence

15          Defense counsel asked the court to exclude evidence of the 1997 incident with

16  Medjed.  RT 42-43.  The court rejected counsel's argument, noting "that incident clearly falls

17  within the purview of Evidence Code section 1109."  RT 105.  The Court of Appeal rejected the

18  claim of error, relying on People v. Falsetta, 21 Cal. 4th 903 (1999) and People v. Johnson, 77

19  Cal. App. 4th 410 (3rd Dist. 2000), noting:

20          [T]he constitutionality of section 1109 under the due process
            clauses of the federal and state constitutions has now been settled.
21

22  Answer, Ex. B at 17-18 (citation omitted).

23          In Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991), the Supreme Court left open

24  the question whether the use of propensity evidence would violate due process.   Because the

25  Court declined to reach the question, there is no clearly established federal law forbidding the use

26  of such evidence.  Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir.), cert. denied, 540 U.S. 930

1   (2003); see also Smith v. Pliler, 278 F. Supp. 2d 1060, 1074-75 (N.D. Cal. 2003) (Cal. Evid.

2   Code § 1109 does not violate due process); cf.  United States v. LeMay, 260 F.3d 1018, 1026

3   (9th Cir. 2001) (finding no due process violation in similar provision of Federal Rules of

4   Evidence).  Accordingly, the state Court of Appeal's decision did not violate clearly established

5   federal law.

6   VII.  Irregularities In State Procedure

7            Petitioner argues that the Petition for Review to the California Supreme Court

8   submitted by appointed appellate counsel contained information from his case and mixed in

9   documents from the case of a different, "infamous California convicted criminal."  Pet. at 16

10  (emphasis in original).  Irregularities in a state's post-conviction process, however, do not form

11  the basis for habeas relief.  See Jackson v. Duckworth, 112 F.3d 878, 880 (7th Cir. 1997).  A writ

12  may issue only if a person's continued confinement violates the federal constitution.  See Estelle,

13  502 U.S. at 67-68.

14           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

15  writ of habeas corpus be denied.

16  /////

17  /////

18  /////

19  /////

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED:  June 28, 2005.

10

11

12  UNITED STATES MAGISTRATE JUDGE

13

14  2/jone0979.157

15

16

17

18

19

20

21

22

23

24

25

26